THE ATLANTIC GIANT POWDER COMPANY *v.* THE DITTMAR
POWDER MANUFACTURING COMPANY and others.

*(Circuit Court, S. D. New York.    March 13, 1880.)*

PATENT—REISSUE No. 5,799—COMBINATION OF NITRO-GLYCERINE WITH
INFUSORIAL EARTH OR OTHER ABSORBENT SUBSTANCE.—Question con-
sidered whether patentee derived knowledge of the invention from the
alleged infringer of the patent.

Former decisions in relation to reissue No. 5,799 followed.

Application for preliminary injunction for alleged infringe-
ment of a patent.

*George Gifford* and *Causten Browne,* for plaintiff.

*Everett P. Wheeler,* and *Clarence Lexow,* for defendants.

BLATCHFORD, J.    This is an application for a preliminary
injunction, founded on reissued letters patent No. 5,799,
granted to the Giant Powder Company, March 17, 1874, the
original patent having been granted to Julius Bandmann, as
assignee of Alfred Nobel, the inventor, as No. 78,317, May
26, 1868, being the same reissued patent which was before
this court in the case of the same plaintiff against Rand, and
in the case of the same plaintiff against Parker, both of them
decided May 5, 1879.

The specific samples of powder complained of were sold by
the defendant, the Dittmar Powder Manufacturing Company,
through the defendant Carl Dittmar, and are two in number,
No. 1 and No. 2.    Dr. Hayes testifies that, by analysis, 100
parts by weight of No. 1 contain, nitro-glycerine, 67.64 parts;
cellulose, (paper stock,) 16.82; saltpetre, (nitrate of soda,)
15.54; that, by analysis, 100 parts by weight of No. 2 con-
tain, nitro-glycerine, 27.86 parts; sawdust and charcoal,
in nearly equal proportions, 5.59; saltpetre, (nitrate of soda,)
66.55; that, in his opinion, the solid ingredients found in each
of said analyses constitute together an absorbent substance,
which is an equivalent of the infusorial earth specifically
mentioned in the plaintiff's patent; that the powders so
examined by him are each a combination of nitro-glycerine,
with such absorbent substance in substantially the same man-
ner as the combination of nitro-glycerine and infusorial earth

specifically mentioned in said patent; that the said solid ingredients have the property of absorbing, and retaining by absorption, nitro-glycerine, and are free from any quality which will cause them to decompose, destroy or injure nitro-glycerine; that the nitro-glycerine is combined with them in such proportions as to be retained without liability to separation, by compression or leakage; that the said solid redients are not liable to explode by concussion, as nitro-glycerine is; that the entire combinations constitute, in his opinion, "safety powders," which can undergo the ordinary shocks of transportation and manipulation without explosion; that the nitro-glycerine therein is explosible, in blasting operations, by the means ordinarily employed for exploding nitro-glycerine; that, while the mixture is in the form of a powder, the nitro-glycerine remains, in his opinion, so compact and concentrated as to have its original explosive power; and that the cellulose, or paper stock ("pulp,") and the sawdust, in said mixtures, perform the same function as charcoal, or carbon, both as to the absorption of the nitro-glycerine, and as to combustion by the heat of the explosion of the nitro-glycerine, and they perform it in the same way, and they perform no other function. In the Rand case the defendants' powder contained, nitro-glycerine, 34.71 parts; nitrate of potash, 52.68 parts; sulphur, 5.84 parts; woody fiber, charcoal and resin, in nearly equal proportions, 5.77 parts. In the Parker case the defendants' powder contained, nitrate of soda, 56 parts; charcoal, 14 parts; nitro-glycerine, 30 parts. In the Goodyear case, before Judge Shepley, the defendants' powder contained, nitro-glycerine, 32.60 parts; nitrate of soda, 49.46 parts; charcoal, 9.63 parts; sulphur, 8.31 parts. All of these powders were held to be infringements of the plaintiff's patent. What Dr. Hayes testifies, as above set forth, in regard to the powders in the present case, shows that they must, for the reasons given in the Rand, Parker and Goodyear cases, be held to be infringements of said patent, unless certain matters presented by the defendants in this case shall be sufficient to lead to a different conclusion.

The defendants contend that the only powder they make

or sell is one called "Dualin," made in accordance with a patent granted to the defendant Dittmar January 18, 1870. They urge the following propositions: (1.) That, in view of matters now presented, the plaintiff's reissued patent, in omitting the word "inexplosive," in discarding the concentration feature of the original patent, and in altering and adding other clauses not contained in the original patent, is broader than the original and void. (2.) That, on the evidence now presented, the Dittmar patent is the first valid and subsisting patent for nitro-glycerine safety powder combinations, composed of nitro-glycerine absorbed in some combustible or explosive, as distinguished from inexplosive substance, and that the plaintiff's reissue should be limited strictly to what is contained within the plain reading of the description of the original patent. (3.) That Dittmar was the original and first inventor of the mixture of nitro-glycerine with some porous solid, as distinguished from fluid or liquid substance, in such proportions as to render the resulting compound a powder safe against the usual shocks of transportation and use, and, therefore, the original and first inventor of the compositions claimed in Nobel's original patent and in the plaintiff's reissue; that Nobel fraudulently and surreptitiously purloined his invention, and that the original and the reissue are void. (4.) That the conduct of the plaintiff and its proceedings heretofore, with respect to its litigations and to Dittmar, have not been such as to justify the application for an injunction at this stage of the suit.

The question of the difference between the original and the reissue in respect to the concentration feature, and in the omission from the reissue of the word "inexplosive," found in the original, in reference to the absorbent substance, was considered and passed upon in the decision of this court in the Rand case favorably to the plaintiff, and the latter point was considered and passed upon in the same way by Judge Shepley in the Goodyear case. In the present case it is contended for the defendants that extrinsic evidence, not in the former cases, is introduced, as to the state of the art of manufacturing explosive compounds in 1867 and 1868, and as to

the use of the word "inexplosive" in that art, which has the effect of showing that the word "inexplosive" was used in the original patent, No. 78,317, in its literal and ordinary sense, and not in the special sense of a substance not liable to explode by accidental concussion. Reference is made to Nobel's provisional English specification, filed May 7, 1867, which speaks of mixing nitro-glycerine with "porous, inexplosive substances, such, for instance, as charcoal and silica," and to his full English specification, filed March 6, 1867, (both of such specifications pertaining to a patent for an invention communicated by Nobel, dated May 7, 1867,) which speaks of causing nitro-glycerine to be "absorbed in porous, inexplosive substances, such as charcoal, paper, silica, or similar materials, whereby it is converted into a powder which I call dynamite or Nobel's safety powder." Reference is also made to the fact that the specification of No. 78,317 states that "porous charcoal has also a considerable absorbent capacity, but it has the defect of being itself a combustible material." Reference is also made to the specification of a patent granted by the United States to the plaintiff and the Giant Powder Company, No. 141,455, August 5, 1873, applied for June 4, 1873, the specification being signed by Nobel, which says: "I have, in former specifications, on which letters patent have been granted to me, described the use and effect of the mixing of nitro-glycerine with other explosives, such as gunpowder, gun-cotton, etc., and also the mixing of nitro-glycerine with non-explosive substances capable of absorbing the nitro-glycerine, and have described the advantage obtained from such mixtures, in greatly increasing the explosive power of such explosives, and in doing away with the extreme danger of handling nitro-glycerine in a liquid condition, and the facilitating of its use for blasting purposes."

The specification then sets forth and claims an explosive compound made by mixing nitro-glycerine with a pulverized nitrate like nitrate of soda, or its equivalent, and a pulverized carbon or hydro-carbon, like resin, or its equivalent, with or without pulverized sulphur, the compound being one which may be handled with safety, and will, when not under

strong restraint, burn on the application of fire, without explosion, but may be exploded by detonation. From these references it is contended that the word "inexplosive" was used in the original patent, No. 78,317, not in the sense of a substance that would not explode by accidental concussion, but in the sense of a substance absolutely inexplosive. It is not perceived that the conclusion sought to be drawn from the premises is a sound one, as applied to the real subject-matter of the invention of Nobel, as to be gathered from the description in the patent, No. 78,317. The views of this court on the subject were fully set forth in its decision in the Rand case, being the same views contained in the decision of Judge Shepley in the Goodyear case, quoted with approval in the Rand case, and it is not necessary to restate them. They are not affected by anything now presented, nor by what is contained in the affidavit of Mr. Parker, or the circular of the plaintiff's agents, or the scientific books adduced, as to the technical meaning of the words "explosive" and "inexplosive."

The principal defence in this case is made on the alleged ground that Dittmar invented what is claimed in reissue No. 5,799, and that Nobel obtained the knowledge of it from Dittmar. Letters patent of Great Britain, dated May 7, 1867, and sealed October 15, 1867, were granted to one Newton, for "improvements in explosive compounds and in the means of igniting the same," being a communication from abroad by Alfred Nobel, of Rue St. Sebastien, Paris, in the empire of France." The provisional specification was filed on the seventh of May, 1867. It read thus: "This invention relates to a method of modifying the nature of nitro-glycerine in a manner which renders it much safer for use than heretofore. Nitro-glycerine, if mixed with porous, inexplosive substances, such, for instance, as charcoal or silica, becomes very much altered in its properties. Thus, for instance, nitro-glycerine alone is not inflammable by a spark, but may be got to explode by submitting it to a very rapid shower of sparks. Nitro-glycerine absorbed in porous substances, on the other hand, easily catches fire from a spark, and burns away slowly and without explosion, except under very close

and resisting confinement, when a violent explosion ensues. Against shocks or blows the above mixture is far less sensitive than nitro-glycerine alone. Owing to the aforesaid properties of the mixture described, its use for blasting metal or very sound rock requires no other firing than an ordinary safety fuse. In shattered rock or coal, on the other hand, it will cause no real explosion at all, the gas will leak out through the crevices and prevent a great accumulation of pressure from the explosive medium, which alone can determine the detonation of nitro-glycerine when absorbed in porous substances, such as, for instance, charcoal or silica. For this reason a special igniter is used to explode the above mixture in fissured or shaky rocks, or wherever it is to be used without close confinement. That special igniter consists of a kind of percussion-cap, wherein the fulminate is caused to develop a very high gaseous pressure before it bursts, which may be attained either by increasing the charge of fulminate or diminishing the leakage of gas before the cap bursts. This cap is adapted to the end of a safety fuse, whereby it is ignited."

The full specification of this patent was filed on the sixth of November, 1867. It read thus: "This invention relates to the use of nitro-glycerine in an altered condition, which renders it far more practical and safe for use. The altered condition of the nitro-glycerine is effected by causing it to be absorbed in porous inexplosive substances, such as charcoal, silica, paper, or similar materials, whereby it is converted into a powder, which I call dynamite, or Nobel's safety powder. By this absorption of the nitro-glycerine in some porous substance, it acquires the property of being in a high degree insensible to shocks, and it can also be burned over fire without exploding. The aforesaid safety powder or dynamite is exploded first, when under very close and resisting confinement, by means of a spark, or any mode of ignition used for firing ordinary gunpowder; second, without or during confinement, by means of a special fulminating cap, containing a strong charge of fulminate, which is adapted to the end of a fuse, and is strongly squeezed to the latter, for the

purpose of more effectually confining the charge, so as thereby to heighten the effect of the detonation; third, by means of an additional charge of ordinary gunpowder, the explosion of the latter will cause the dynamite to go off, even when it is only partially confined. From the aforesaid it will be understood that a strong fulminating cap, if adapted to the fuse by being squeezed thereon, will cause dynamite to explode under all conditions of confinement or non-confinement, and that an additional charge of gunpowder or analogous substance will cause dynamite to explode only when confined, or partially confined, and that any ordinary mode of ignition, as used for gunpowder, for instance, a fuse, will determine the explosion of dynamite only under very close and resisting confinement. It is evident that the above described fulminating cap may be greatly varied in form, but the principle of its action lies in the sudden development of a very intense pressure or shock. In order to insure a perfect stability in the nitro-glycerine contained in the dynamite, the porous substance, before it is saturated with nitro-glycerine, is to be rendered alkaline by washing it with a solution of carbonate of soda, or lime-water, or analogous substance, in order to neutralize the acid and prevent any decomposition of nitro-glycerine from taking place. I would here remark, that the above described safety powder or dynamite, being nitro-glycerine absorbed in porous non-explosive substances, possesses many distinct properties from, and very practical advantages over, liquid nitro-glycerine, and its explosion, except under very close and resisting confinement, requires a special ignition, as described above." The claim is: "The mode herein set forth of manufacturing the safety powder or dynamite herein described, and also the modes of firing the same by special ignition, as herein set forth." This English patent was the precursor of the patent No. 78,317. The story of Dittmar, as told by him, is this: Before the end of 1865, at Bomlitz, near Walsrode, in Hanover, he experimented in mixing nitro-glycerine with nitro-cellulose, which was sawdust or wood fiber treated with nitric acid or nitric and sulphuric acids, and in mixing nitro-glycer-

ine with sawdust first treated with solutions of saltpetre and alkali. He conceived the idea that nitro-glycerine might be changed into a powder, so as to be a safe and efficient explosive. In July, 1866, at Berlin, Theodore Winckler, one of the firm of Alfred Nobel & Co., a firm composed of Nobel, Winckler and Dr. Bandmann, employed him to ascertain the causes of the accidental explosion of liquid nitro-glycerine packed in sawdust. He spoke to Winckler of his idea of changing liquid nitro-glycerine into a powder. He then supervised the erection of a nitro-glycerine factory for Nobel & Co., at Krummel, in Lauenburg, and remained there as its general superintendent until the fall of 1867. Noble returned to Krummel from the United States, in September, 1866.

In August, 1866, Dittmar experimented successfully in mixing nitro-glycerine with lamp black. He also experimented with ground bricks, charcoal, cement, and, lastly, infusorial earth, as absorbents for nitro-glycerine, continuing his experiments with sawdust and nitro-cellulose, and concluded that charcoal and infusorial earth were the best absorbents, the latter being preferable on account of its greater capacity of absorption. His attention was directed to infusorial earth as an absorbent because it was used at Nobel & Co.'s factory, in substitution for sawdust, to pack around the cans of liquid nitro-glycerine in boxes. He noticed that it was very porous, and readily absorbed the nitro-glycerine when the cans leaked. The particular experiments made by him with nitro-glycerine in combination with infusorial earth, as an absorbent, were made about the time Nobel returned, but whether before or immediately after he cannot remember. He did, however, make mixtures of nitro-glycerine with incombustible and inexplosive substances, as absorbents, long prior to the return of Nobel from the United States. Dittmar says: "Alfred Nobel returned in about the beginning of September, 1866. He came to the factory and had many conversations with me in respect of the mixtures of nitro-glycerine with absorbent substances. I had these conversations both with him and Mr. Winckler in his, Nobel's, presence. Nobel desired me to manufacture nitro-glycerine, and, for the purpose

of rendering it safe, to pour wood spirits or wood naptha into the nitro-glycerine, and this I did, making large quantities of this mixture. Nobel insisted that this was the only safe mixture, and claimed that nitro-glycerine, to be rendered safe, must be retained in its liquid condition. He would not listen to representations I made to him that I was convinced, and such conviction had been verified by long and careful experiment, that nitro-glycerine, absorbed by some solid substance, cleansed of all impurities that would decompose it, would, in powder form, be a useful, efficient and safe explosive; and, when I told him of my experiments with sawdust, he ridiculed them and my projects as well, and insisted that I should refrain from making any such mixtures for the future, stating that it was all nonsense, that nitro-glycerine must be retained in its liquid form, that the admixture with wood spirits was the only safe one, and that any admixture with or absorption of nitro-glycerine by a solid substance rendered it even more dangerous than if left in its natural, i. e., liquid condition." Dittmar continued his experiments, mixing nitro-glycerine with inexplosive incombustible substances, principally with infusorial earth. He did not explode them in any drill or rock holes, but fired them by means of a copper shell or cap, with fuse attached, the shell being charged with a strong fulminate and placed upon the mixture to be fired. The fuse exploding the fulminate, the jar caused thereby detonated the charge. Nobel often saw the compounds Dittmar was experimenting upon and the mixtures he was making, and Dittmar often, about the beginning of September, 1866, conversed with Nobel upon the subject of those experiments, the materials he was using, and the purpose he was seeking to attain. After Dittmar had perfected some of his first experimental mixtures of charcoal and nitro-glycerine, Winckler tried them at the mines and reported favorably on them, and then for the first time Nobel evinced some interest in Dittmar's experiments. Dittmar built a furnace and experimented with infusorial earth in quantities, mixed with nitro-glycerine. Nobel pretended not to notice what Dittmar was making there, never came in to look at the furnace, was not pleased with anything

that Dittmar made, and finally Dittmar refrained altogether from speaking to him on the subject. It thus became necessary for Dittmar to employ chiefly the time of Nobel's absence from Krummel to make those experiments, and, when Nobel was there, Dittmar experimented when not under Nobel's scrutiny.

Towards the end of October, 1866, Dittmar made public tests of his mixtures of nitro-glycerine with infusorial earth, as an absorbent, before government officers, at the factory at Krummel, in the presence of Nobel, Winckler and Bandmann, which tests proved eminently successful. The ingredients of such compounds were at that time known to Nobel, inasmuch as Dittmar had revealed to him what they were. Nobel, after the successful issue of such tests, and while Dittmar was further experimenting with infusorial earth in combination with nitro-glycerine, mixed some of the infusorial earth that had been tried and prepared by Dittmar, with nitro-glycerine, in a glass jar. The only original experiment ever made there by Nobel was that of painting sheets of common paper with liquid nitro-glycerine, and then rolling them up in the form of a cartridge. Dittmar says: "I continued my experiments, covering almost every known absorbent substance, both explosive and inexplosive, both combustible and incombustible, with the view of discovering that substance which, either naturally or under chemical treatment, would, without decomposition, absorb the largest quantity of nitro-glycerine without detracting from the explosive force thereof, and either assist or enhance the force of explosion, while at the same time rendering the compound a safe and efficient powder, until the fall of 1867, when I left the employment of Nobel & Co. From November, 1866, until I left their employment as aforesaid, I made large quantities of the compound, consisting of nitro-glycerine and infusorial earth, in the proportion of about 70 per cent. of nitro-glycerine to about 30 per cent. of infusorial earth, and these were sold during said period in open market. In the spring of 1867 Nobel stated to me that he was going to take a pleasure trip

to England.   Owing to the fact that I had made shipments of nitro-glycerine to England, for Nobel's firm, I supposed that he was going to England in relation to such shipment and for pleasure simply, and did not suspect any motive or design on his part to overreach me.   I therefore continued in the employment of his firm, and prosecuted my researches and experiments in nitro-glycerine combinations.   During the summer of 1867 Nobel returned from England.   He stated to me that he had visited England, and frequently came to my house, and, while there, inspected the experiments that I in the meantime had made in respect to nitro-glycerine combinations, and had many and extended conversations with me in respect thereto.   I told him that the result of my experiments since his departure for England had demonstrated the advisability of preferring an explosive or combustible to an inert, inexplosive or incombustible substance as an absorbent, inasmuch as, as aforesaid, such inert matter detracted from the explosive force of the nitro-glycerine, while a combustible or explosive substance rather added to the force of the explosion, performing, at the same time, the identical functions in respect to reduction to powder form and safety in handling and transportation, and that sawdust, neutralized, so as to free it of all qualities that would decompose the nitro-glycerine, would, in combination with the latter and saltpetre, add to its explosive force in lieu of detracting from it, and could be fired without recourse to a strong fulminating cap, or would, in other words, be a compound in itself explosive by common ignition."

Dittmar left Nobel & Co.'s employment in the fall of 1867, and went to Berlin, to Capt. Schultze's factory, and became a partner in the business relating to the manufacture of explosive powders.   He says: "While with Schultze I perfected that part of my invention relating to combinations of nitro-glycerine with combustible and explosive substances. * * * * I then applied for letters patent to the government of Great Britian and Ireland, making applications for like letters, also, to the governments of Russia and Prussia, respectively.   The combination of nitro-glycerine with infu-.

sorial earth having, by experiment, proved itself so much
inferior to combinations with combustible and explosive sub-
stances, as absorbents, I, in my applications for such letters
patent, wholly discarded inert substances, such as said infu-
sorial earth, chalk, brick-dust and the like, and made such
applications for combinations with combustible and explosive
substances only.   It was upon the return of my application
to the British government that I was first informed of the
fact that Nobel, during his sojourn in England, had applied
for and obtained English letters for my invention aforesaid.
The result of my application for an English patent was a
provisional protection.   *   *   *   *   The Prussian govern-
ment refused to grant me letters patent, upon the application
made by me as aforesaid, upon the ground that the mixture of
nitro-glycerine and powder had been employed for blasting
purposes."   Dittmar allowed his Russian application to fall,
and did not perfect a patent in England for what was covered
in England by such provisional protection.

The English provisional protection consisted of a provis-
ional specification, filed by one Johnson, December 5, 1867,
on a communication from Dittmar.   It was as follows:
"Hitherto the employment of nitro-glycerine for blasting and
similar purposes has been attended with considerable danger,
and the object of this invention is not only to render its
employment safe, but to enable it to be transported and
stored free from its present attendant liability to explosion.
In carrying out this invention the nitro-glycerine is mixed
with a porous combustible substance, such, for example, as
finely divided wood charcoal, which, by preference, has been
previously saturated with a solution of saltpetre, or nitrate
of soda, or mixtures of the same, and also with a solution of
carbonate of soda, and subsequently dried, so as to expel the
water employed for effecting such solution; or the nitro-
glycerine may be mixed with what is known as nitro-cellulose,
that is to say, with finely divided wood or other solid ligneous
matter, which has been treated with nitric and sulphuric acid
in a manner similar to that employed for the production of
gun cotton; or the nitro-glycerine may be mixed with saw-

dust, or finely divided solid ligneous matter, previously impregnated with a solution of nitrate of potash, or nitrate of soda, or mixture of the same, and with an alkali, such as carbonate of soda, and subsequently dried, so as to expel the water employed for effecting the solution of the before-mentioned salts; or, instead of employing the substances prepared as herein before mentioned, in combination with nitro-glycerine individually, mixtures of the same may be employed, and, when such mixtures of any two or more of the before-mentioned substances are employed with nitro-glycerine, the proportions of the same may be varied according to the desired requirement of the blasting material."

Both the provisional and the full specifications of Nobel's English patent were filled before Dittmar's English provisional specification was filed. Nobel's full English specification distinctly says that the article he produces is a powder. The English provisional specification of Dittmar does not say that his article is a powder. No patent allowed to Dittmar, or printed publication of anything invented by him, is produced containing a description of what is described in reissue No. 5,799. The only question is as to whether Nobel, instead of having himself invented what is described in reissue No. 5,799, derived knowledge of it from Dittmar, in the manner and under the circumstances set up.

It is stated by Dittmar that, because of Nobel's dissatisfaction with his experiments, he experimented during Nobel's absence, and refrained from speaking to Nobel on the subject of such experiments; and, although Dittmar states that Nobel knew what the ingredients were of the compounds of nitro-glycerine and infusorial earth which Dittmar used in his public tests made in October, 1866, and that from November, 1866, until the fall of 1867, Dittmar made large quantities of the compound of nitro-glycerine and infusorial earth, in the proportion of about 70 per cent. of nitro-glycerine to about 30 per cent. of infusorial earth, it does not appear that these proportions were communicated by Dittmar to Nobel. There is nothing in Dittmar's story which goes to show that, after October, 1866, Nobel was not himself experimenting, without

the knowledge of Dittmar, with mixtures of nitro-glycerine and absorbents. Dittmar did not regard the compound he used in October, 1866, of nitro-glycerine and infusorial earth, as one of entire success, and as a compound showing a substance which would, without decomposition, absorb the largest quantity of nitro-glycerine without detracting from its explosive force, because, after October, 1866, he continued his experiments until the fall of 1867, with a view of discovering that substance. For some time before the fall of 1867 he seems to have confined his attention to mixtures of nitro-glycerine with sawdust. There is nothing in the entire statement of Dittmar which goes to show that Nobel derived from Dittmar knowledge of what is described in re-issue No. 5,799, or in patent No. 78,317, or that Dittmar made any invention that is described in his patent of January 18, 1870, before Nobel made the invention described in reissue No. 5,799.

If it were the fact that what Dittmar now says as to his being the real inventor of the invention described in reissue No. 5,799, amounted to enough to warrant the denial of the plaintiff's motion, it would be impossible to accept what he says as worthy of reliance, in view of the circumstances under which he says it now, after having been silent about it in former litigations, in one of which, the suit against Parker, he made an affidavit, the only purport of which was to show that reissue No. 5,799 was void for want of novelty.

In regard to the contention that the plaintiff has, by its conduct towards Dittmar, deprived itself of the right to a preliminary injunction, it appears that the plaintff has been engaged in a series of litigations, for several years, to establish that reissue No. 5,799 covers powders substantially the same as those involved in this motion; that the plaintiff has done nothing to induce Dittmar to believe that a claim to the right on his part to make powders such as those involved in this motion was acquiesced in by the plaintiff; and that, on behalf of the plaintiff, Mr. Rix denies the allegations of Dittmar as to his making such powders without objection from the plaintiff; and as to there being any understanding or agreement between Rix and Dittmar that Dittmar was the real

inventor of what was covered by reissue No. 5,799, or that powders such as those involved in this motion did not infringe said reissue, or that Dittmar should withhold the testimony which he now brings forward.

There must be a preliminary injunction against Dittmar and the Dittmar Powder Manufacturing Company, as to powders like the samples No. 1 and No. 2. The plaintiff does not make out a case for an injunction against any of the other defendants. It does not offer any proof as to any articles made according to the Dittmar patent, and, therefore, it is unnecessary to refer to that patent, and none of the defendants but Dittmar and the company are shown to have been connected with the said samples